960 F.2d 806
 60 USLW 2668, Prod.Liab.Rep. (CCH) P 13,152
 In re HAWAII FEDERAL ASBESTOS CASES. (Four Cases)
David K. KAIU; Lillian M. Kaiu, Plaintiffs-Appellees,
v.
RAYMARK INDUSTRIES, INC., a corporation, formerly known as
Raybestos-Manhattan, Inc., et al., Defendants,
and
Fibreboard Corporation, formerly known as Fibreboard Paper
Products Corporation, a Delaware corporation,
Defendant-Appellant.
Antonia Beatrix SAWYER, individually and as Special
Administratrix of the Estate of Stephen Charles Sawyer,
deceased and as Guardian Ad Litem for Andrew John Sawyer,
Corrina Antonia Sawyer, and Margaret Ann Sawyer, all minor
children, Plaintiff-Appellee,
v.
RAYMARK INDUSTRIES, INC., a corporation, formerly known as
Raybestos-Manhattan, Inc., et al., Defendants,
and
Fibreboard Corporation, formerly known as Fibreboard Paper
Products Corporation, a Delaware corporation,
Defendant-Appellant.
Toledo MONDEREN; Maria L. Monderen, Plaintiffs-Appellees,
v.
RAYMARK INDUSTRIES, INC., a corporation, formerly known as
Raybestos-Manhattan, Inc., et al.,
and
Fibreboard Corporation, formerly known as Fibreboard Paper
Products Corporation, a Delaware corporation,
Defendant-Appellant.
Ted MINA, Personal Representative for the Estate of Mariano
Gamurot, deceased; Domingo Del Rosario; Alice C.
Digos, Plaintiffs-Appellees,
v.
FIBREBOARD CORPORATION, formerly known as Fibreboard Paper
Products Corporation; a Delaware corporation,
Defendant-Appellant,
and
Raymark Industries, Inc., a corporation, formerly known as
Raybestos-Manhattan, Inc., et al., Defendant.
Ted MINA, Personal Representative for the Estate of Mariano
Gamurot, deceased; Domingo Del Rosario; Alice C.
Digos, Plaintiffs-Appellees,
v.
RAYMARK INDUSTRIES, INC., a corporation, formerly known as
Raybestos-Manhattan, Inc., et al., Defendant,
and
Owens-Illinois, Inc., et al., Defendants-Appellants.
 Nos. 89-15313, 89-15315, 89-15319, 89-16599 and 89-16637.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 9, 1991.
Decided March 31, 1992.
 
 George A. Cumming, Jr., Brobeck, Phleger & Harrison, San Francisco, Cal., Jerold T. Matayoshi, Greeley, Walker & Kowen, Honolulu, Hawaii, for defendants-appellants.
 L. Richard DeRobertis, Gary O. Galiher, Galiher DeRobertis, Law Corp., Honolulu, Hawaii, for plaintiffs-appellees.
 Appeal from the United States District Court for the District of Hawaii.
 Before: SCHROEDER, FLETCHER and FERGUSON, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 These consolidated appeals arise from judgments based on jury verdicts entered in the plaintiffs' favor in four of the hundreds of asbestos product liability actions pending in the district court in coordinated proceedings. The cases now on appeal were brought by or on behalf of individuals who were exposed to asbestos dust while serving in the United States Navy, and who suffered asbestosis or cancer as a result. Plaintiff Sawyer's decedent was a sailor aboard the cruiser Topeka and other warships. Plaintiffs Kaiu and Monderen, and the Mina plaintiffs' decedent, worked in various Naval shipyards including Pearl Harbor. The defendants are a number of companies who manufactured and supplied asbestos products to the Navy. Not all of the defendants appeal.
 
 
 2
 The district court consolidated fourteen asbestosis cases, including the Sawyer, Kaiu and Monderen actions, for trial before a single jury. It then tried a group of cancer cases, including the Mina action, before another jury. All of the cases were tried on theories of strict liability.
 
 
 3
 The jury awarded varying amounts of damages to the Sawyer, Kaiu, Monderen, and Mina plaintiffs. After reducing the awards to account for amounts received in settlement, the district court entered final judgments imposing joint and several liability on the remaining non-settling defendants in each case.
 
 
 4
 Appellant Fibreboard Corporation, a supplier of insulation products containing asbestos to the Navy both during and after World War II, was a non-settling defendant in all four actions. It appeals from the judgments in each. The issues it appeals are for the most part common to the four cases. Fibreboard challenges the district court's decision to strike the military contractor defense raised as a barrier to liability; the court's refusal to instruct the jury that it should consider whether the acts and omissions of the Navy constituted a supervening cause of the plaintiffs' injuries; the district court's refusal to admit "state-of-the-art" evidence concerning what it knew or should have known regarding the dangers of asbestos at the time the plaintiffs suffered their injuries; and the imposition of joint and several liability for the damages awarded to the plaintiffs. In addition, Fibreboard contends that the plaintiffs in the Sawyer and Mina actions did not adduce sufficient evidence of their decedents' exposure to Fibreboard's products and argues that the district court should, as a result, have granted its motions for a directed verdict or a judgment notwithstanding the verdict in those cases. In Mina, it also asserts that the district court lacked subject matter jurisdiction.
 
 
 5
 Appellant Owens-Illinois, another supplier of asbestos insulation to the Navy, was granted summary judgment in the Sawyer case and has settled its appeals in the Kaiu and Monderen actions. Thus, it appeals only the judgment in Mina, joining in Fibreboard's challenges with respect to the military contractor defense, the introduction of state-of-the-art evidence, and the failure to give supervening cause instructions. Owens-Illinois also contends that the district court erred by instructing the Mina jury, at Fibreboard's request, to include non-party manufacturers and suppliers of asbestos along with party defendants in its apportionment of liability and by subsequently entering a judgment holding Owens-Illinois jointly and severally liable for the non-parties' share of damages.
 
 
 6
 We have jurisdiction over these consolidated appeals pursuant to 28 U.S.C. § 1291 (1988) and affirm the rulings of the district court.
 
 I.
 
 7
 As a preliminary matter, we must address Fibreboard's contention that the district court did not have subject-matter jurisdiction over the Mina action. Jurisdiction in all four suits rested on diversity of citizenship. Fibreboard notes, however, that several of the Mina plaintiffs reside in California, and argues that since its principal place of business is also in California, complete diversity is lacking.
 
 
 8
 This argument, raised for the first time on appeal, is frivolous. Fibreboard, in the interrogatory responses it filed below, stated that its principal place of business was Portland, Oregon. In 1988, after the Mina plaintiffs had filed their complaint, Fibreboard apparently changed its principal place of business to California. It is wellsettled that the existence of complete diversity is assessed at the time of the filing of a complaint and that subsequent changes in the citizenship of an existing party do not affect the determination of jurisdiction. Smith v. Sperling, 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1113 n. 1, 1 L.Ed.2d 1205 (1957); Mann v. City of Tucson, 782 F.2d 790, 794 (9th Cir.1986). Since complete diversity obtained at the time the Mina plaintiffs filed their complaint, the district court properly exercised jurisdiction over their action.
 
 II.
 
 9
 In Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the Supreme Court outlined the contours of the military contractor defense. Under certain conditions, this defense, which is rooted in the federal common law, immunizes contractors who supply military equipment to the Government from the duties imposed by state tort law. Such displacement of ordinary tort liability "occur[s] only where ... a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law....' " Boyle at 507, 108 S.Ct. at 2516 (quoting Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 69, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966)). Thus, "[l]iability for design defects in military equipment cannot be imposed [on military contractors], pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Boyle, 487 U.S. at 512, 108 S.Ct. at 2518.
 
 
 10
 The Court justified the imposition of the military contractor defense as a barrier to state tort actions on the grounds that "the selection of the appropriate design for military equipment to be used by our Armed Forces," Boyle at 511, 108 S.Ct. at 2518, is a discretionary function for which the United States cannot be sued directly under the Federal Tort Claims Act. See 28 U.S.C. § 2680(a) (1988). "[This process of selection] often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." Boyle at 511, 108 S.Ct. at 2518. "[P]ermitting 'second-guessing' of these judgments ... through state tort suits against contractors would," the Court reasoned, "produce the same effect sought to be avoided by the [§ 2680(a) ] exemption. The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs." Boyle at 511-512, 108 S.Ct. at 2518.
 
 
 11
 The Court thus held that the action before it was barred by federal law. The father of a Marine pilot who had drowned when he was unable to open the escape hatch of his military helicopter underwater sued for the loss of his son. The Government had provided detailed military specifications in contracting for the purchase of the helicopter, specifications which extended to the design and operation of the hatch. The Court concluded that the pervasive nature of the federal interest precluded a state-law action against the helicopter manufacturer for the allegedly faulty design of the hatch.
 
 
 12
 The appellants here seek to invoke the military contractor defense as a barrier to the plaintiffs' actions against them. The court below struck the defense, reasoning in part that asbestos insulation is not military equipment and that Boyle does not, as a result, authorize the displacement of state tort law duties imposed on those who manufacture or distribute such insulation. In re Hawaii Federal Asbestos Cases, 715 F.Supp. 298, 300 (D.Hawaii 1988). We agree with the district court.
 
 
 13
 The Boyle Court repeatedly described the military contractor defense in terms limiting it to those who supply military equipment to the Government. "We are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a 'significant conflict' with federal policy and must be displaced." Boyle, 487 U.S. at 512, 108 S.Ct. at 2518. "Liability for design defects in military equipment cannot be imposed [ ] pursuant to state law," when the elements of the defense are satisfied. Id.
 
 
 14
 The Court pointedly noted that the fact that a company supplies goods to the military does not, in and of itself, immunize it from liability for the injuries caused by those goods. Where the goods ordered by the military are those readily available, in substantially similar form, to commercial users, the military contractor defense does not apply. "If, for example, a federal procurement officer orders, by model number, a quantity of stock helicopters that happen to be equipped with escape hatches opening outward, it is impossible to say that the Government has a significant interest in that particular feature. That would be scarcely more reasonable than saying that a private individual who orders such a craft by model number cannot sue for the manufacturer's negligence because he got precisely what he ordered." Boyle at 509, 108 S.Ct. at 2517.
 
 
 15
 The Court rejected expansion of the Feres doctrine, which immunizes the Government from liability for injuries incurred by members of the military incident to their service, Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), to cover military contractors, in large part because it deemed too broad a rule which would bar all suits by military personnel against military contractors. "[I]f the Government contractor defense is to prohibit suit against the manufacturer whenever Feres would prevent suit against the Government, then even injuries caused to military personnel by a helicopter purchased from stock ... or by any standard equipment purchased by the Government, would be covered." Boyle, 487 U.S. at 510, 108 S.Ct. at 2517 (emphasis added).
 
 
 16
 That Boyle speaks of the military contractor defense as immunizing contractors only with respect to the military equipment they produce for the United States is consistent with the purposes the Court ascribes to that defense. The Boyle Court noted that the military makes highly complex and sensitive decisions regarding the development of new equipment for military usage. Allowing the contractors who are hired to manufacture that equipment to be sued for the injuries caused by it would impinge unduly on the military's decisionmaking process. The contractors would either refuse to produce the military equipment for the Government or would raise their prices to insure against their potential liability for the Government's designs. Boyle at 512, 108 S.Ct. at 2518.
 
 
 17
 These same concerns do not exist in respect to products readily available on the commercial market. The fact that the military may order such products does not make them "military equipment." The products have not been developed on the basis of involved judgments made by the military but in response to the broader needs and desires of end-users in the private sector. The contractors, furthermore, already will have factored the costs of ordinary tort liability into the price of their goods. That they will not enjoy immunity from tort liability with respect to the goods sold to one of their customers, the Government, is unlikely to affect their marketing behavior or their pricing.
 
 
 18
 This circuit's opinions are consistent with Boyle's rationale. In Neilsen v. George Diamond Vogel Paint Co., 892 F.2d 1450 (9th Cir.1990), we rejected the argument that the military contractor defense barred an action brought by a former employee of the Army Corps of Engineers against a paint manufacturer. The plaintiff alleged that fumes from a paint he had used extensively while working for the Corps had caused him brain damage. Noting that the paint "was not designed for any special military purpose," Neilsen, 892 F.2d at 1453, but rather was "designed to further civilian ... objectives," id. at 1455, we reaffirmed the view we first expressed in McKay v. Rockwell Int'l Corp., 704 F.2d 444 (9th Cir.1983), cert. denied, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984), that the military contractor defense does not apply to "an ordinary consumer product purchased by the armed forces." Id. at 451. In doing so, we cited approvingly to the district court's opinion in this case. "Our decision is in accord with the only other post-Boyle reported decision of which we are aware that involved the procurement of nonmilitary equipment. See In re Hawaii Federal Asbestos Cases, 715 F.Supp. 298, 300 (D.Hawaii 1988)." Neilsen, 892 F.2d at 1455.
 
 
 19
 We agree with the district court that the asbestos insulation alleged to have caused the plaintiffs' injuries here does not represent military equipment entitling its manufacturers to the protections of the military contractor defense. The plaintiffs introduced significant evidence below that the insulation sold by Fibreboard and Owens-Illinois to the Navy was the very same insulation which those companies marketed to commercial buyers. This insulation was not manufactured with the special needs of the military in mind. To the contrary, the military constituted a relatively insignificant purchaser of products that were primarily designed for applications by private industry.
 
 
 20
 The evidence presented by the plaintiffs to the district court included testimony given in Hawaii state court proceedings by an Owens-Illinois executive who had been heavily involved in the production and marketing of the Kaylo insulation which Owens-Illinois sold to the Navy. The executive declared that this Kaylo insulation was primarily sold to private companies in the petroleum and chemical industries. "[S]ome of our biggest customers were the petroleum people, oil plants, power plants, chemical plants where they have miles and miles of pipe outside and exposed to the elements." He further stated that, in comparison to the volume of Kaylo insulation marketed by Owens-Illinois in the private sector, "very, very, little" was sold to the Navy. Consistent with this testimony was an advertisement placed by Owens-Illinois in the Petroleum Engineer in 1952 which described the development of the Kaylo product and listed a host of petroleum companies as Kaylo purchasers. The plaintiffs similarly introduced evidence, through the testimony of a Fibreboard executive during the early portion of the trial, that the Pabco insulation sold by Fibreboard to the Navy was exactly the same product sold by Fibreboard in significant quantities to private industry.
 
 
 21
 The defendants did not controvert this evidence. Nor have their arguments before this court placed into serious dispute the plaintiffs' assertions that the products responsible for their injuries were not specialized items of military equipment but were, instead, goods sold on the ordinary commercial market. Thus, the military contractor defense does not shield the defendants from liability in this action.
 
 
 22
 Even if the asbestos insulation were military equipment, we would still affirm the district court's decision that the contractor defense does not preclude plaintiffs' recovery. The plaintiffs proceeded, and the jury below was instructed, on two distinct theories of strict liability. The plaintiffs alleged that the defendants had produced and sold insulation which did not meet the safety expectations of an ordinary consumer (the consumer expectations theory of liability). The plaintiffs also claimed that the defendants had failed to provide adequate warning of the dangers inherent in their asbestos insulation (the failure to warn cause of action).
 
 
 23
 We agree with the district court that, as to this second theory of liability, the military contractor defense offers Fibreboard and Owens-Illinois little comfort even if their asbestos insulation is viewed as military equipment. The appellants conceded in the district court that the Navy in no way prohibited them from placing warnings on their insulation products. They could have provided detailed and prominent statements regarding the dangers of asbestos insulation without violating the terms of their procurement contracts or their product specifications. There thus existed no conflict between their state law duty to provide adequate warnings to the users of their insulation and the conditions imposed on them pursuant to the agreements they had entered into with the Government.
 
 
 24
 As a result, a crucial element of the military contractor defense as defined in Boyle is missing. Owens-Illinois and Fibreboard have simply failed to allege, let alone establish, that in making their decisions regarding warnings they were acting in compliance with "reasonably precise specifications" imposed on them by the United States. Boyle, 487 U.S. at 512, 108 S.Ct. at 2518. As the Second Circuit recently noted in In re Joint Eastern and Southern District New York Asbestos Litigation, 897 F.2d 626, 632 (2nd Cir.1990), "[s]tripped to its essentials, the military contractor's defense under Boyle is to claim, 'The Government made me do it.' Boyle displaces state law only when the Government, making a discretionary, safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion." Here, the Government did not require Fibreboard or Owens-Illinois to do anything with respect to the placement of warnings on their products. Nothing in Boyle suggests preemption of a state law duty to warn under such circumstances.
 
 
 25
 Plaintiffs in a sense have complicated their case. Had they proceeded to trial only on a failure to warn theory of liability, the military contractor defense would, as indicated, be no defense at all. However, the jury also was instructed on an alternate theory, consumer expectations, and the verdict forms do not reveal on which theory the jury found liability. It could be argued, therefore, that the jury found liability on the consumer expectations, and not the failure to warn, claim. As to the former the military contractor defense conceivably possesses greater viability.
 
 
 26
 To impose liability under the consumer expectations theory, the plaintiff must show that the foreseeable use of a product involves substantial danger that would not be recognized by the consumer. If the defendants could demonstrate, assuming again that the district court was wrong and we are dealing with military equipment, that the Government's specifications required asbestos in their products, and not just a certain level of performance, the military contractor defense might be available.
 
 
 27
 However, this argument ultimately fails since a reasonable jury could not have found liability with respect to the plaintiffs' consumer expectations claim without also finding liability on their failure to warn cause of action. The district court instructed the jury that to allow recovery for a failure to warn under Hawaii law, it would have to find that the uses to which the appellants' insulation were put were reasonably foreseeable, that such uses involved "a substantial danger that would not be readily recognized by the ordinary user of the product," and that the appellants had "failed to give adequate warnings of such danger." The first two elements of this tort are virtually identical to elements of the consumer expectations cause of action as to which the jury was also instructed. Thus, a jury which found consumer expectations liability would necessarily have found these two elements of the failure-to-warn claim satisfied as well.
 
 
 28
 As to the third element, the defendants conceded below that they provided no warnings whatsoever regarding the dangers of their asbestos insulation until 1966. Given that the plaintiffs here alleged injuries from exposure to appellants' insulation dating as far back as World War II, it is clear that for a substantial portion of the time period covered by this suit the appellants did not provide adequate warning of the dangers inherent in their products. After 1966, the appellants did place a warning label on their insulation which advised of the danger of breathing asbestos dust.[1] However, the appellants' warning labels were typically placed only on the outside covering of their insulation bats. When this covering was removed and the insulation placed in the Navy's ships, nothing remained to alert shipyard workers and sailors to the dangerous nature of the asbestos dust emanating from the insulation torn out in the process of overhauling the ships.
 
 
 29
 The appellants' failure to alert those individuals who worked most closely with their insulation products, like the plaintiffs here, to the dangers of asbestos exposure was patently clear from the evidence. That the inadequacy of the defendants' warnings was a legal cause of the plaintiffs' injuries cannot be denied. The plaintiffs could have taken precautionary measures or left their jobs had they been warned of the dangers. A reasonable jury, in reaching its verdict of liability, necessarily would have found from the evidence that the defendants breached their state law duty to warn both before and after the introduction of warning labels in 1966. Thus, even were asbestos insulation "military equipment," we would affirm the district court's decision to preclude the military contractor defense.
 
 III.
 
 30
 Fibreboard and Owens-Illinois appeal the district court's refusal to instruct the jury that it could find the actions of the Navy to be a supervening cause of the plaintiffs' injuries. The effect of such a finding would have been to absolve the defendant manufacturers and suppliers of asbestos insulation of any liability for those injuries.
 
 
 31
 The appellants assert that the Navy took woefully inadequate steps to protect its workers from the dangers of asbestos exposure. Thus, they contend that the Navy failed to provide those workers with respirators or to enforce the use of such devices, that it did not maintain adequate ventilation in areas where asbestos dust was being created, and that it did not educate its workers to the dangers of asbestos. They argue that these failures represent the "sine qua non" of the plaintiffs' injuries, and that the district court should, as a result, have accepted their proposed instructions. These instructions would have essentially informed the jury that if it thought the Government knew or should have known of the perils of asbestos exposure and nevertheless failed to implement appropriate safeguards in the workplace, it should not find the appellants liable for any injuries suffered by the Government's workers even if it viewed the appellants' products or actions to be a substantial factor contributing to those injuries.
 
 
 32
 In diversity actions, since state law is applied, it controls the substantive content of jury instructions.[2] In re Asbestos Cases, 847 F.2d 523, 524 (9th Cir.1988). Federal law, however, governs the determination of whether an incorrect instruction results in prejudicial error. Id. "Prejudicial error results when, 'looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered.' " Id. (quoting Pollock v. Koehring Co., 540 F.2d 425, 426 (9th Cir.1976)).
 
 
 33
 Under Hawaii law, the intervening actions of a third party supersede an earlier tortfeasor's liability for a plaintiff's injuries only where the third party's "conduct was so unusual, so out of the ordinary, so unforeseeable as to be unanticipatable from a legal point of view." Mitchell v. Branch, 45 Haw. 128, 363 P.2d 969, 975 (1961); see also McKenna v. Volkswagenwerk Aktiengesellschaft, 57 Haw. 460, 558 P.2d 1018, 1022-1024 (1977) (reaffirming the Mitchell Court's views of superseding cause).[3] The appellants do not identify any evidence introduced below which indicated that the Navy's actions were so "unusual" or "out of the ordinary" as to warrant a superseding cause instruction. While they make much out of the Navy's failure to provide proper warnings and safety devices to its workers, nowhere do they suggest that they, as the suppliers of asbestos insulation to the Navy, could not have foreseen the Navy's omissions.
 
 
 34
 The Hawaii courts have noted that while a "plaintiff has the burden of proving that an alleged superseding cause is not a superseding cause, ... [this] burden arises only when [a] defendant produces sufficient evidence to raise the issue." Leyson v. Steuermann, 5 Haw.App. 504, 705 P.2d 37, 47 n. 11 (1985). Here, Fibreboard and Owens-Illinois have simply failed to adduce any evidence suggesting the Navy's actions were extraordinary or of an unforeseeable nature. Thus, the district court correctly ruled that, as a matter of Hawaii law, the Navy's actions did not absolve the appellants of liability for the plaintiffs' injuries. It was not error to refuse to submit a superseding cause instruction to the jury.[4]
 
 IV.
 
 35
 The appellants sought to introduce evidence demonstrating that they neither knew nor could have known of the dangers posed by their asbestos insulation given the state of scientific and technological knowledge available to them at the time they supplied their insulation to the Navy. The district court refused to allow the introduction of such "state-of-the-art" evidence, holding that under Hawaii law strict liability is not "conditioned upon the manufacturer's having knowledge or reason to know of the dangers associated with its product. State-of-the-art is a negligence defense which has no place in any strict liability action...." In re Hawaii Federal Asbestos Cases, 699 F.Supp. 233, 238 (D.Hawaii 1988).
 
 
 36
 In In re Asbestos Cases, we certified to the Hawaii Supreme Court the following question: "In a strict products liability case for injuries caused by an inherently unsafe product, is the manufacturer conclusively presumed to know the dangers inherent in his product, or is state of the art evidence admissible to establish whether the manufacturer knew or through the exercise of reasonable human foresight should have known of the danger?" 829 F.2d 907, 909 (9th Cir.1987) (opinion following resolution of certified question). The Hawaii Supreme Court responded that, in strict liability actions, "the plaintiff need only show that the seller is engaged in the business of selling the product, that the product contains a defect dangerous to the user or consumer, and that the defect is the cause of the injury ... It is clear, therefore, that ... the issue of whether the seller knew or reasonably should have known of the dangers inherent in his or her product is irrelevant to the issue of liability. Although highly relevant to a negligence action, it has absolutely no bearing on the elements of a strict products liability claim. We, therefore, hold that in a strict products liability action, state-of-the-art evidence is not admissible for the purpose of establishing whether the seller knew or reasonably should have known of the dangerousness of his or her product." Johnson v. Raybestos-Manhattan, Inc., 69 Haw. 287, 740 P.2d 548, 549 (1987) (emphasis in original) (citations omitted).
 
 
 37
 While the Hawaii Supreme Court interpreted the question we certified to it narrowly, and thus purported to decide only that evidence regarding a defendant's actual or constructive knowledge of the perils of its products is irrelevant in cases where a plaintiff challenges the inherent dangerousness of those products, 740 P.2d at 549 n. 2, we construed its ruling as applying to suits challenging the adequacy of a defendant's warnings as well. Thus, we ruled that state-of-the-art evidence should not have been presented to the jury in that case, which the plaintiff had brought on a failure-to-warn theory of strict liability. In re Asbestos Cases, 829 F.2d at 908-909 (opinion following resolution of certified question).
 
 
 38
 Under Hawaii law as we have construed it, therefore, evidence as to the possible extent of a defendant's knowledge concerning the dangerousness of its own products is not admissible in either consumer expectations or failure-to-warn cases. The district court did not err in rejecting the state-of-the-art evidence.
 
 
 39
 The appellants point out, however, that the Hawaii Supreme Court, in responding to the question certified in In re Asbestos Cases, left open the possibility that state-of-the-art evidence might be introduced in strict liability actions for purposes other than demonstrating that a defendant could not have discovered the injurious nature of its products. "Whether or not state-of-the-art evidence is probative of some other factor that is relevant in a strict products liability action (e.g., consumer expectations, which bears on whether a product is defective) and therefore admissible for that limited purpose is an issue beyond the scope of the certified question." Johnson, 740 P.2d at 549 n. 3. However, the appellants in our cases have not suggested any other purposes for which they might have utilized state-of-the-art evidence at trial. "[D]efense counsel has not suggested a situation where state-of-the-art evidence could possibly be relevant in the strict liability phase of this asbestos litigation." 699 F.Supp. at 235. The offer of proof which the appellants made to the district court went only to establish that they did not know the dangers of asbestos until very late in the day. This, of, course, is precisely the sort of evidence we have deemed inadmissible under Hawaii law in strict liability actions.
 
 
 40
 It is not the function of the district court or this court to speculate as to what other uses the appellants might have put state-of-the-art information to in this case. Evidence regarding what consumers might reasonably have expected of a defendant's product is certainly relevant where the challenge to the product is lack of certain features which allegedly would have made it safer. Here, the plaintiffs simply challenged the inherent dangerousness of the appellants' products and the lack of warnings. The only state-of-the-art argument concerning consumer expectations which the appellants might have made in response to these challenges would have been to suggest that the average individual expected asbestos insulation to pose serious health risks to those coming into close contact with it. This would, of course, have been a preposterous argument given the appellants' claims that they themselves did not know of the dangers of asbestos until 1966. We find no basis, therefore, for reversing the district court's state-of-the-art ruling.
 
 V.
 
 41
 Fibreboard challenges the district court's denials of its motions for a directed verdict and a judgment notwithstanding the verdict (JNOV) in the Sawyer and Mina actions. It asserts that the Sawyer and Mina plaintiffs presented insufficient evidence of their decedents' exposure to its Pabco insulation. "We review a directed verdict under the same standard as that which we apply when reviewing a JNOV. A directed verdict is proper when the evidence permits only one reasonable conclusion as to the verdict ... We consider all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party." Peterson v. Kennedy, 771 F.2d 1244, 1256 (9th Cir.1985), cert. denied, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986).
 
 
 42
 Two different approaches have been taken by the courts in determining the sort of evidence an asbestos plaintiff must adduce in order to establish a defendant's products as a legal cause of her injuries. Some courts have demanded particularized proof that a plaintiff came into contact with a manufacturer's products before allowing her recovery from that manufacturer. Thus, in Blackston v. Shook & Fletcher Insulation Co., 764 F.2d 1480 (11th Cir.1985), the Eleventh Circuit, applying Georgia law, rejected the argument that "a rebuttable presumption of exposure should arise once a plaintiff has shown that defendant's asbestos-containing products were used at a job site at a time that the plaintiff was employed at the job site." Id. at 1483. The court held that a plaintiff must either name the specific asbestos-containing products to which she was exposed and introduce corroborating evidence of her contact with those products, or present the testimony of those who could recall seeing her work with a particular company's goods. The court recognized that these requirements present plaintiffs with "formidable proof problems in their attempts to show causation." 764 F.2d at 1485. The passage of time and the fact that plaintiffs will typically have worked with a large number of asbestos-containing products in an environment where the identity of those products is not readily ascertainable suggest that requiring plaintiffs to assert unequivocally that they dealt with the goods of particular defendants will frequently preclude recovery. The Blackston court, however, thought this result compelled by Georgia law.
 
 
 43
 Other courts have determined that the problems of proof inherent in requiring a plaintiff to identify by name the asbestos products to which she was exposed dictate a less rigid approach. In Lockwood v. AC & S, Inc., 109 Wash.2d 235, 744 P.2d 605 (1987), the Supreme Court of Washington held that, in order to withstand a motion for directed verdict, an asbestos plaintiff does not have to "personally identify the manufacturers of asbestos products to which he was exposed in order to recover from those manufacturers. Because of the long latency period of asbestosis, the plaintiff's ability to recall specific brands by the time he brings an action will be seriously impaired. A plaintiff who did not work directly with the asbestos products would have further difficulties in personally identifying the manufacturers of such products. The problems of identification are even greater when the plaintiff has been exposed at more than one job site and to more than one manufacturer's product." Lockwood, 744 P.2d at 612.
 
 
 44
 The Court concluded that, as long as a plaintiff introduces evidence suggesting that the products of a particular defendant were present at the worksite and thus could be said to have contributed to the asbestos exposure of which she complains, she can recover from that defendant. Accordingly, it upheld a jury verdict in favor of a plaintiff who could not remember having come into contact with the defendant's products, and who presented no other direct evidence that he had worked with or near those products. Because the plaintiff had introduced testimony of other workers suggesting that the defendant's products were used on the various ships on which he had performed repair and overhaul work, the Court declared that he had created an inference of exposure to those products sufficient to support the jury's verdict. Lockwood, 744 P.2d at 612-13. See also Roehling v. National Gypsum Co., 786 F.2d 1225, 1228 (4th Cir.1986) ("We disagree with the district court that direct evidence is needed showing that [the plaintiff] identified the asbestos products or that the witnesses knew, had contact with, or recognized [the plaintiff] as being on the job site. Such burden is unreasonable."); In re New York City Asbestos Litigation, 144 Misc.2d 42, 542 N.Y.S.2d 118 (N.Y.Sup.Ct.1989) (other workers' identification of defendants' products as being regularly used in area of shipyard where plaintiff worked sufficient evidence of exposure to those products to withstand directed verdict).
 
 
 45
 While the Hawaii courts are yet to address the issue, we conclude that in light of Hawaii's recognized public policy of providing "the maximum possible protection that the law can muster against dangerous defects in products," Stewart v. Budget Rent-A-Car Corp., 52 Haw. 71, 470 P.2d 240, 243 (1970), they would adopt the less restrictive approach to questions of asbestos causation embodied in cases like Lockwood.[5] Under this approach, the Sawyer and Mina plaintiffs clearly presented sufficient evidence of their decedents' exposure to Pabco insulation to support jury verdicts against Fibreboard.
 
 
 46
 Plaintiff Sawyer introduced considerable testimony that his decedent had been involved in the overhaul of warships including the Buckley, the Maddox, the Topeka and the Rathburne, and that his job included sweeping up the dust after asbestos insulation had been ripped off the ships' piping. Decedent's supervisors and co-workers testified that Fibreboard's Pabco insulation was removed from all four ships during these overhauls. Supervisors and fellow employees of plaintiff Mina's decedent testified that he had worked with Pabco insulation in his capacity as pipefitter at the Pearl Harbor shipyard and that he was exposed to significant quantities of asbestos dust in the process. This testimony was sufficient to support an inference of exposure to Pabco insulation in both the Sawyer and Mina actions such that a reasonable jury could have found for the plaintiffs and against Fibreboard in both cases.
 
 VI.
 
 47
 Fibreboard asserts that the district court erred in imposing joint and several liability on the non-settling defendants in each of the four actions before this Court. This contention is frivolous. In an amendment to the Hawaii Revised Statutes which generally abolished joint and several liability, the Hawaii legislature expressly excepted "the recovery of economic and noneconomic damages against joint tortfeasors in actions involving ... [t]oxic and asbestos-related torts." Haw.Rev.Stat. § 663-10.9 (1988).[6] It is difficult to conceive of a clearer legislative directive.
 
 
 48
 Fibreboard's argument that the Hawaii courts have nevertheless declined to apply the doctrine of joint and several liability to asbestos manufacturers is entirely unconvincing. Fibreboard points to Nobriga v. Raybestos-Manhattan, Inc., 67 Haw. 157, 683 P.2d 389 (1984), to support this argument. There the Hawaii Supreme Court, at the end of a decision on the proper allocation of settlement credits between a plaintiff and two non-settling defendants, remanded the case for the entry of a final judgment which was to reflect the jury's apportionment of responsibility between those defendants.
 
 
 49
 The jury had made this assessment of responsibility pursuant to the provisions of Hawaii's Uniform Contribution Among Tortfeasors Act, Haw.Rev.Stat. § 663-11 et seq., which allows a defendant who pays the whole of a judgment to recover from her fellow defendants that share of the award which a jury has attributed to them. As the Hawaii Supreme Court made clear in Peterson v. City and County of Honolulu, 51 Haw. 484, 462 P.2d 1007, 1008 (1970), this Act, while "provid[ing] for apportionment of the common liability of joint tortfeasors as among themselves, ... does not affect the joint and several liability of each defendant toward the plaintiff." The Nobriga Court did not question this principle. We are unpersuaded by Fibreboard's efforts to draw from the Nobriga Court's reference to the allocation of responsibility among asbestos defendants, which is an entirely separate question, the conclusion that such defendants are not jointly and severally liable to plaintiffs for the injuries they have caused. The district court did not err in imposing joint and several liability.
 
 VII.
 
 50
 Owens-Illinois does not contest the assessment of joint and several liability for the Mina judgment from which it has taken its appeal. Rather, it argues that the district court should not have included non-party manufacturers of asbestos insulation in the list of companies among which the jury was to apportion fault. The jury attributed thirty-five percent of the responsibility for those injuries to one such non-party, the Johns-Manville Corporation.[7] With a minor exception, all other entities listed on the verdict form were parties.[8]
 
 
 51
 Owens-Illinois argues that the text of Hawaii's Uniform Contribution Act and the case law interpreting it do not allow the jury to allocate a share of the responsibility for a plaintiff's damages to non-parties. Owens-Illinois fails to identify, however, the injury it has suffered from the inclusion of non-parties on the jury's special verdict form in this case. Owens-Illinois does not contend that the amount of damages awarded the plaintiffs was greater than it otherwise would have been because of Johns-Manville's presence on the verdict form. Nor does it assert that the jury would have allocated a greater share of the responsibility for the plaintiffs' injuries to the plaintiffs themselves had it not been required to apportion fault to Johns-Manville. Rather, Owens-Illinois' contention appears to be that the amount of contribution among party defendants would somehow differ to its benefit if the jury were to re-apportion responsibility without taking Johns-Manville into account.
 
 
 52
 We do not see how this follows. Owens-Illinois stated at oral argument that, under Hawaii law, each party defendant will assume a pro rata share of that portion of the plaintiffs' award which the jury attributed to Johns-Manville. Even if the plaintiffs seek to recover their award from Owens-Illinois, then, it will in turn be able to recoup from other party defendants not only their explicit share of the award but also their pro rata portion of Johns-Manville's liability. The result presumably would be no different than if the jury had not included Johns-Manville on its tally sheet in the first instance. A rational jury performing the recalculation Owens-Illinois demands would presumably allocate responsibility to each defendant in an amount equal to its original portion of the award plus its share of Johns-Manville's liability. We see no reason why Owens-Illinois, which is currently responsible for the same share of the plaintiffs' award as Fibreboard and Pittsburgh-Corning, would find itself in any different a position after this computation. We decline Owens-Illinois' invitation to remand the Mina action for a new trial.
 
 VIII.
 
 53
 We find no reversible error in the district court's rulings below.[9] We affirm the judgments in favor of the plaintiffs in all four of the appeals.
 
 
 54
 AFFIRMED.
 
 
 
 [1]
 The label read as follows. "CAUTION: This product contains asbestos fibre. If dust is created when this product is handled, avoid breathing the dust. If adequate ventilation control is not possible, wear a respirator approved by the U.S. Bureau of Mines."
 
 
 [2]
 We decline appellants' invitation to fashion a federal common law doctrine of supervening cause. As we indicated in Part I, supra, because this case does not involve the supply of military equipment to the United States, we do not believe it to implicate those "uniquely federal interests" that warrant the displacement of state tort law. See Boyle, 487 U.S. at 504-512, 108 S.Ct. at 2518
 
 
 [3]
 Both the Mitchell and McKenna Courts quoted approvingly from Section 447 of the Restatement (Second) of Torts, which provides, inter alia, that the intervening acts of a third party do not absolve an earlier tortfeasor from liability if a "reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted...." McKenna, 558 P.2d at 1023 n. 2; Mitchell, 363 P.2d at 976
 
 
 [4]
 One of Fibreboard's proposed instructions drew upon Section 452 of the Restatement (Second) of Torts. This section provides that under certain circumstances the duty to prevent harm to a plaintiff passes entirely from an original tortfeasor to a third party, typically as a result of the passage of time. Fibreboard points to no cases, however, in which the Hawaii courts have adopted Section 452's notion of a complete shift in legal responsibility. Furthermore, we agree with the Third Circuit's interpretation of Section 452 as essentially applying only to negligence actions and as providing a supplier of products containing a latent defect with no immunity from liability except in situations involving a substantial lapse in time between purchase and injury. Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481, 497 (3rd Cir.1985)
 
 
 [5]
 The Stewart case, indeed, centered on an issue of causation. The question presented in that case was whether a plaintiff whose rental car had veered off a road had presented sufficient evidence that a defect in the car was responsible for her mishap. The plaintiff's expert was unable to point to a mechanical flaw in the car as the cause of her accident, and no eyewitnesses were available to testify as to the circumstances leading up to it. The Court held, however, that the plaintiff's own testimony that she had been driving along a straight and level highway at the time of her accident and that the day was clear created a sufficient inference of mechanical failure to support a jury verdict in her favor. The Hawaii Supreme Court has often since invoked Stewart's declaration of maximum protection for persons injured by defective goods in deciding product liability issues. See, e.g., Kaneko v. Hilo Coast Processing Co., 65 Haw. 447, 654 P.2d 343, 346-350 (1982) (concluding that prefabricated building was a "product" to which doctrine of strict liability would apply)
 
 
 [6]
 The Hawaii legislature has since provided that joint and several liability will apply once again to all actions in tort effective October 1, 1991 Haw.Sess.Laws, Act 62, § 1
 
 
 [7]
 Johns-Manville was not made a party to the Mina action because of a bankruptcy stay that remained in effect for the duration of the district court proceedings
 
 
 [8]
 The jury's apportionment of responsibility was as follows: Owens-Illinois (6.5%); Fibreboard (6.5%); Pittsburgh-Corning (6.5%); Raymark Industries (13.2%); H.K. Porter Co. (5%); Eagle-Picher (3.5%); Owens-Corning Fiberglass (3%); Carey Canada (0.6%); Johns-Manville, a non-party (35%); Asbestos Corp., a non-party (0.2%); Plaintiffs (20%)
 
 
 [9]
 We decline plaintiffs' request to levy sanctions, however, as many of the questions raised on appeal were substantial in nature